**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| KEITH G. GIFFORD, | ) | NO. EDCV 09-00728 SS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION AND ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**INTRODUCTION**

Keith G. Gifford ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying his application for Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 7, 2006 (Administrative Record ("AR") 87-92).  He alleged a disability onset date of July 17, 2005, (AR 87), due to back pain and addiction to prescription medication.  (AR 29-32).  The Agency denied Plaintiff's claim for DIB initially on October 18, 2006.  (AR 53-57).  This denial was upheld upon reconsideration.  (AR 61-65).

On June 23, 2008, Administrative Law Judge ("ALJ") Thomas P. Tielens conducted a hearing to review Plaintiff's claim.  (AR 20-50). The ALJ denied benefits on July 21, 2008.  (AR 7-16).  Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied his request on July 23, 2007.  (AR 1-3).  The ALJ's decision therefore became the final decision of the Commissioner.  (AR 1).  Plaintiff commenced the instant action on May 15, 2009.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on November 26, 1955 and was fifty-two years old at the time of the hearing.  (AR 25).  He has completed high school and briefly attended college.  (Id.).  In 1991, Plaintiff took a course in telecommunication equipment installation at ITT Tech.  (Id.). Approximately two years before the hearing, Plaintiff completed twelve classes through Global University to become a certified minister. (Id.).  Plaintiff previously worked as a plumber.  (AR 227).

2

## A.   __Plaintiff's Medical History__

The ALJ noted that Plaintiff had the severe impairments of status post right hip replacement as well as multilevel degenerative disk disease of the thoracic and lumbar spine. (AR 12). Plaintiff was also diagnosed with depression and polysubstance abuse, as well as alcohol dependence and pain medication addiction. (<u>Id</u>).

Plaintiff's medical records show that he has been seeking treatment for hip problems, back pain, and narcotics addiction since mid 2003. Plaintiff was treated numerous times by Dr. Thomas W. Jackson ("Dr. Jackson") beginning in May of 2003. (AR 217-26). On May 23, 2003, Plaintiff underwent a total hip replacement on the right hip. (AR 222, 225). On June 25, 2003, Dr. Jackson noted that Plaintiff's hip was "extremely stable" and that his pain had "decreased." (AR 225). Dr. Jackson further noted, however, that Plaintiff "had some troubles with some of the narcotic dependency problems, which w[ere] expected." (<u>Id</u>.). On August 12, 2003, Dr. Jackson noted that Plaintiff's pain in his right hip was "drastically reduced," but that Plaintiff still had "ongoing back problems." (AR 223). On September 12, 2003, Dr. Jackson noted that Plaintiff was doing "exceptionally well" with his hip replacement and that his "major current problem" was the heavy use of narcotic pain medication. (AR 221). On November 10, 2003, Dr. Jackson noted that Plaintiff had "basically no pain in the hip at all," but that he still had "ongoing troubles with his back and [wa]s scheduled for back surgery." (AR 220).

Plaintiff was also treated numerous times by Dr. A. Cook ("Dr. Cook") from mid 2003 to early 2004. (AR 217-26). On May 8, 2003, July 8, 2003, and September 16, 2003, Dr. Cook performed a variety of surgical procedures to treat Plaintiff's back pain.[1] (AR 202-09). On September 16, 2003, Dr. Cook noted that Plaintiff reported a "substantial reduction" in pain following the surgical procedures, but that Plaintiff still had "substantial pain present." (AR 200). Dr. Cook further reported that Plaintiff's range of motion in his lumbar spine had "markedly improved since the previous procedure was performed." (Id.). On January 6, 2004, Dr. Cook noted that Plaintiff described his pain on a scale of 0-10 as a 5. (AR 199). Dr. Cook further noted that Plaintiff was taking Hydrocodone and Robaxin and that Plaintiff "denie[d] any side effects or dysfunction associated with the medication." (Id.). Specifically, Dr. Cook reported that Plaintiff "state[d] that he [wa]s able to function and maintain his level of activity with the use of the medication." (Id.).

---

[1] On May 8, 2003, Dr. Cook performed the following procedures: (1) "Right L4-5 epidural enzymatic and mechanical nerve root adhesiolysis"; (2) "Epidurogram"; (3) Sterotactic placement of epidural needle under real time fluoroscopic guidance"; and (4) "Temporary placement of epidural catheter." (AR 208). On July 8, 2003, Dr. Cook performed the following procedures: (1) "Right L4 and L5 transforaminal epidural steroid injection under fluoroscopy"; (2) "Epidurogram" (3) "Stereotactic placement of needle under real time fluoroscopic guidance." (AR 204). On September 16, 2003, Dr. Cook performed the following procedures: (1) "Lumbrosacral epidural enzymatic and mechanical nerve root adhesiolysis with epidural steroid injection" (2) "Epidurogram"; (3) "Stereotactic placement of epidural needle under real time fluoroscopic guidance" and (4) "Temporary placement of epidural catheter." (AR 202).

4

By August 10, 2005, Dr. Jackson reported that Plaintiff was doing "extremely well" with his hip replacement and did not "limp or have any other symptoms." (AR 217). Dr. Jackson further noted that Plaintiff's lower back pain "tended to decrease" as a result of the successful hip replacement. (Id.). Dr. Jackson diagnosed Plaintiff with "multiple level degenerative disc disease and spondylosis with spinal stenosis of the lumbar spine." (AR 218). Dr. Jackson recommended a lumbar epidural and facet injections as treatment instead of further surgery. (Id.). Dr. Jackson concluded that if this treatment was successful, "nothing else would [need to] be done." (Id.).

On September 18, 2006, Plaintiff was admitted at the Hemet Valley Medical Center for drug and alcohol detoxification. (AR 246). Dr. Aung Thu ("Dr. Thu") reported that Plaintiff had been taking Morphine Sulfate, Methadone, Fentanyl, Norco, and Soma, as well as drinking alcohol "once or twice a week for the last eight months." (AR 248). Dr. Thu diagnosed Plaintiff with: (1) "Opiate dependence"; (2) "Alcohol dependence, episodic"; (3) "Nicotine dependence, in remission" (4) "Chronic back pain"; (5) "Status post right total hip replacement" (6) "Moderately severe" psychosocial and environmental problems; and (7) a "Global Assessment of Functioning" or "GAF" of 35. (AR 251). Plaintiff "successfully finished the detoxification treatment protocol and . . . was discharged home on September 29, 2006." (AR 247).

**B.   Consultative Examinations**

Dr. Romualdo R. Rodriguez ("Dr. Rodriguez"), a psychiatrist, examined Plaintiff on October 9, 2006. (AR 263-69). Dr. Rodriguez

diagnosed Plaintiff with: (1) "Alcohol Dependence"; (2) "Alcohol Dependence, Supposedly in Full Sustained Remission"; (3) "Major Depressive Disorder in Remission"; (4) "Psychosocial stressors over the past year: Moderate"; and (5) "Current GAF: 70." (AR 267-68). Dr. Rodriguez noted that "as long as [Plaintiff] stays clean from all drugs and totally sober and continues on his psychiatric medications he will continue to be relatively stable." (AR 268). Dr. Rodriguez concluded that Plaintiff was: (1) "Able to understand, remember, and carry out simple one or two-step job instructions"; (2) "Able to do detailed and complex instructions" (3) "Minimally limited in ability to relate and interact with supervisors, coworkers and the public"; (4) "Minimally limited in ability to maintain concentration and attention, persistence and pace"; (5) "Minimally limited in ability to associate with day-to-day work activity, including attendance and safety"; (6) "Minimally limited in ability to adapt to the stresses common to a normal work environment"; (7) "Minimally limited in ability to maintain regular attendance in the work place and perform work activities on a consistent basis"; (8) "Minimally limited in ability to perform work activities without special or additional supervision"; and (9) "[N]ot capable of independently managing funds in an appropriate manner." (AR 268-69).

Dr. Bunsri T. Sophon ("Dr. Sophon"), an orthopedic surgeon, examined Plaintiff on October 10, 2006. (AR 256-61). Dr. Sophon diagnosed Plaintiff with: (1) "Status post right total hip replacement"; (2) "Fracture, right femur, status post IM nailing and removal of nails"; and (3) "Thoracic and lumbosacral spine strain." (AR 260). Dr. Sophon noted that despite Plaintiff's claims of constant back pain, "the physical examination revealed excellent range of motion of the

thoracolumbar spine." (Id.).  Dr. Sophon concluded that Plaintiff could lift and carry 50 pounds occasionally and 20 pounds frequently and that Plaintiff did not have any limitations in sitting, standing, or walking. (Id.).

C.   **State Agency Physicians**

Medical consultant H. Amado, M.D., ("Dr. Amado") reviewed Plaintiff's medical records for the Disability Determination Service ("DDS") and issued a Psychiatric Review Technique on October 12, 2006. (AR 278-89).  Dr. Amado diagnosed Plaintiff with "[d]epression NOS related to general medical condition," (AR 281), and "PSA, early remission from ethanol."  (AR 284).  Dr. Amado concluded that these conditions imposed only mild functional limitations on Plaintiff.  (AR 286).  Because Plaintiff's mental condition imposed only mild functional limitations, Dr. Amado determined that Plaintiff did not have a severe mental impairment.  (AR 288).

Medical consultant K. D. Gregg, M.D., ("Dr. Gregg") also reviewed Plaintiff's medical records for the DDS and issued a Case Analysis on March 22, 2007.  (AR 303).  Dr. Gregg noted that Plaintiff's medical records showed addiction to alcohol and illegal substances which was in remission.  (Id.).  Dr. Gregg further noted that Plaintiff's mental impairments placed only "minimal limits on [his] ability to do adl's and interact with others and tol[e]rate stress."  (Id.).  Dr. Gregg ultimately concluded that Plaintiff's mental impairment was not severe. (Id.).

**D.   Plaintiff's Testimony**

On June 23, 2008, Plaintiff appeared at a hearing before the ALJ. (AR 22).  Plaintiff testified that he stopped working in July of 2005. (AR 26).  Plaintiff explained that he did not think he could work in his former field, but that he hoped to get back to work and believed he was "making progress." (AR 28).  Plaintiff stated that he thought he "could handle a job" where he "could sit up or . . . be able to stand up[]" and "move around a little bit." (AR 30).  Plaintiff explained that he just needed to be able to move around because his pain is triggered by staying in a certain position for extended periods of time.  (_Id._).  Plaintiff further stated that he believed he could do computer work because he could "adjust the seating, get up and stand and walk." (AR 35).

Plaintiff testified that he sometimes can stand "for a long time, especially if [he is] doing something that takes [his] mind off the pain." (AR 33).  On a good day, Plaintiff stated that he could stand for 2 hours. (_Id._).  Plaintiff further stated that he was "building up [his] stamina" and that he was hoping to improve his limit. (_Id._).  Plaintiff explained that he could sit for approximately an hour and a half or two hours and then he would need to stand up for "a little while." (AR 33).  Plaintiff stated that he could "sit back down" again after taking a break to stand up. (_Id._).  Plaintiff explained, however, that "[b]ending over forwards is terrible." (AR 33).  Plaintiff similarly explained that lifting is very difficult, "especially if [he is] bending forward to do [it]." (AR 34).

8

Plaintiff acknowledged having a history of alcohol and drug use and stated that the last time he used alcohol was in August of 2006. (AR 35). Plaintiff stated that he had not used drugs in "almost 2 years . . . except for [a] little experience with . . . Adderall." (Id.). Plaintiff explained that he was "all strung out" on Morphine and Fentanyl for approximately two years and needed medical detox. (AR 29). Plaintiff testified that he was unable to "take narcotic medication because [he is] an addict." (AR 30).

Plaintiff explained that he was currently taking Trazodone at night to help him sleep as well as Wellbutrin, Lithium, and Lamictal. (AR 31). Plaintiff was also taking Provigil to help him stay awake and he stated that the Provigil was "working pretty well." (AR 37). Plaintiff testified that he was initially prescribed Adderall to help him stay awake, (AR 36), but that he could not "seem to handle" it because of his addiction to narcotics. (AR 31). Plaintiff similarly testified that he was initially prescribed Xanax, but that he no longer takes the medication because it made him "too depressed." (Id.). Plaintiff stated that if his pain becomes unmanageable, he sometimes takes Toradol tablets or gets Toradol shots, which is a non-narcotic pain reliever. (AR 32). Plaintiff explained that he believed the epidural injections in his back were helping. (AR 35).

Plaintiff testified that he is able to do small jobs, such as occasionally blowing and raking leaves. (AR 27). Plaintiff stated that he can walk "possibly a half a mile" before experiencing pain and currently swims laps and does "other exercises." (AR 32). Plaintiff explained that he "stay[s] busy . . . assisting [his] pastor with

visitation for [Plaintiff's] congregation in the hospital and visiting shut-ins and working some of the helpful positions at the church as far as the facilities on Sunday morning, making sure all the teachers are there and making sure that the kids aren't running around and making sure everything's in place." (AR 26). Plaintiff stated that on some weeks he volunteers for only 4 hours and that other weeks he volunteers as many as 10 or 15 hours. (Id.).

Plaintiff summarized his testimony as follows:

Well, I'll try to bottom line it for you. Your Honor, I just loved the construction industry. Had been in it since that failure year at college, I went, I dropped out of college and went into construction and I just loved it and been in it all my life and I just wished I had known then what I know now about pacing myself and being more careful with my back. I got in an auto accident, they say that's why I had to have a hip replacement. That's doing well, that's doing very well, but in order to stay off the narcotics, I have to keep the pain level down to a tolerable level. I can go three, it bounces back between a two and a four, depending on what I'm doing. Sometimes, for a different number of reasons, a lot of times I'm not sure, that it will bounce up to a five, but as long as I'm -- the hardest part's been for me is learning those limitations. For me, it was devastating emotionally to all of a sudden find out I can't do what I've been doing for years. I believe that the antidepressants and everything had helped me ride that out, but my goal now is to

1    get off the antidepressants and start taking vitamin
2    supplements because I do want to get retrained and work.

4    (AR 38).

6    **E.    Vocational Expert's Testimony**

8    Steven P. Davis testified at the June 23, 2008 hearing as a
9    vocational expert ("VE").  (AR 46).  After the VE heard Plaintiff's
10   testimony and reviewed his file, the ALJ posed two hypotheticals to the
11   VE.  In both, the VE considered a person "the same age as [Plaintiff]
12   who has the same educational background and past work experience."  (AR
13   47).  In the first hypothetical, the ALJ described a person that "could
14   do light work [but], would need to change positions for a few moments
15   every hour and take the normal breaks."  (<u>Id.</u>).  The person "[c]ould not
16   use ladders, ropes or scaffolds" and "[s]hould only occasionally climb,
17   balance, stoop, kneel, crouch or crawl."  (<u>Id.</u>).  The person "[w]ould
18   need to avoid concentrated exposure to heights, hazards and vibrations."
19   (<u>Id.</u>).  Given this hypothetical, the VE found that such a person could
20   not return to any of Plaintiff's past work as a plumber's helper, a
21   groundskeeper, or a general laborer.  (AR 46-47).  The VE further
22   testified, however, that such a person could find available work in the
23   national or local economy as a table worker or as an electrical
24   equipment assembler.  (AR 47-48).

26   The second hypothetical was identical to the first, except with the
27   restriction that the person was "limited by an inability to work full
28   days, full workweeks and for a variety of reasons, [wa]s going to be

missing work two or more days per month, more than an employer would normally allow." (AR 48). The VE testified that such a person could not "maintain competitive employment."

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

---

[2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

    (2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

    (3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

    (4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

    (5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

<u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1); <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

    The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  <u>Bustamante</u>, 262 F.3d at 953-54.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the

claimant's residual functional capacity ("RFC"),[3] age, education, and work experience. <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000).

## V.

## THE ALJ'S DECISION

        The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 15).  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (AR 12).  Next, at step two, he found that Plaintiff had the severe impairments of status post right hip replacement and multilevel degenerative disk disease of the thoracic and lumbar spines, but that Plaintiff did not have a severe mental impairment.  (AR 12-13).

---

        [3]    Residual functional capacity is "the most [one] can still do despite [one's] limitations" and represents an assessment "based on all the relevant evidence in [one's] case record."   20 C.F.R. §§ 404.1545(a), 416.945(a).

At the third step, the ALJ found that the severe impairments at step two did not meet or medically equal a listed impairment. (AR 13). Next, at step four, the ALJ found that Plaintiff could no longer perform his past work, but he retained the RFC to perform light work with restrictions. (AR 13-15). Specifically, the ALJ found that Plaintiff had the RFC to perform light work with "limitation to occasional climbing, balancing, stooping, kneeling, crouching and crawling, preclusion from working on ladders, ropes, and scaffolds, and the need to avoid concentrated exposure to vibrations and work hazards (heights and machinery)." (AR 13).

Finally, at step five, the ALJ concluded that, based on Plaintiff's RFC and the testimony of the VE, Plaintiff could perform work as a table worker and electrical assembler. (AR 16). Accordingly, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act, at any time through the date of the decision. (Id.).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

15

1    "Substantial evidence is more than a scintilla, but less than a

2    preponderance." Reddick, 157 F.3d at 720.  It is "relevant evidence

3    which a reasonable person might accept as adequate to support a

4    conclusion." Id.  To determine whether substantial evidence supports

5    a finding, the court must "'consider the record as a whole, weighing

6    both evidence that supports and evidence that detracts from the

7    [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny

8    v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can

9    reasonably support either affirming or reversing that conclusion, the

10   court may not substitute its judgment for that of the Commissioner.

11   Reddick, 157 F.3d at 720-21.

12

13                                    **VII.**

14                                 **DISCUSSION**

15

16       Plaintiff contends the ALJ erred for three reasons.  First, he

17   claims that the ALJ failed to properly consider the type, dosage,

18   effectiveness, and side effects of Plaintiff's medications.  (Joint

19   Stipulation ("Jt. Stip.") at 2-6).  Second, he claims that the ALJ

20   failed to properly consider lay witness testimony.  (Jt. Stip. at 6-11).

21   Third, he contends that the ALJ failed to properly consider the treating

22   psychiatrist's opinion and Plaintiff's hospitalization.  (Jt. Stip. at

23   11-15).  For the reasons discussed below, the Court disagrees with all

24   of Plaintiff's contentions.

25   \\

26   \\

27   \\

28

                                      16

**A.   Plaintiff's Claim Regarding Side Effects Of Medication Lacks Merit Because The Record Does Not Demonstrate That Side Effects Impaired Plaintiff's Ability To Work**

Plaintiff contends that the ALJ failed to consider the type, dosage, effectiveness, and side effects of Plaintiff's medications. (Jt. Stip. at 2-6). Specifically, Plaintiff argues that the ALJ failed to discuss or consider Plaintiff's use of Morphine, Flexeril, and Ibuprofen. (Id. at 3). Plaintiff's claim lacks merit.

Although the "type, dosage, effectiveness, and side effects" of any medication taken by the claimant to alleviate his or her pain or other symptoms are factors relevant to a disability determination and should be considered by the ALJ, 20 C.F.R. § 404.1529(c)(3)(iv); see also Social Security Ruling ("SSR") 96-8p, available at, 1996 WL 374184, a claimant bears the burden of proving that an impairment, including a medication's side effects, is disabling. See Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985) (claimant failed to meet burden of proving that an impairment was disabling where he produced no clinical evidence showing that his prescription narcotic use impaired his ability to work). Plaintiff has not met his burden in this case.

As an initial matter, Plaintiff relies solely on his own reporting of side effects in two undated disability reports. (Jt. Stip. at 3). In the first undated disability report, Plaintiff indicated that he was taking Morphine 30mg for pain and that this medication made him "drowsy." (AR 127). In the second undated disability report, Plaintiff indicated that he was taking Flexeril, which caused "fatigue," and

Ibuprofen, which caused "stomach problems." (AR 150). Despite the complete lack of detail in these reports, Plaintiff argues that "[i]t is self-evident that a high powered narcotic such as Morphine would produce the alleged symptoms . . . and would affect [his] ability to safely and effectively perform work related tasks required of light work." (Jt. Stip. at 6).

Plaintiff's reliance on his undated disability reports ignores his own testimony that directly contradicts the reports. Indeed, Plaintiff testified that he has not taken Morphine in "almost 2 years." (AR 30). Plaintiff explained that he was "all strung out" on Morphine and Fentanyl for approximately 2 years, but then underwent medical detox. (AR 29). Plaintiff further explained that he no longer takes narcotic medication because his is "an addict."[4] (AR 30). When asked by the ALJ what medications he was currently taking, Plaintiff stated that he was taking Trazodone, Wellbutrin, Lithium, Lamictal, Provigil, and Toradol. (AR 31-32, 37). Plaintiff did not state that he was taking Morphine, Flexeril, or Ibuprofen. (AR 31-32).

Moreover, when discussing the medications that he was taking, Plaintiff did not describe any side effects. (AR 31-32, 37). Indeed, Plaintiff stated that the Toradol tablets and shots "can help . . . on

---

[4]   Plaintiff alleges a disability onset date of July 17, 2005. To the extent Plaintiff is arguing that side effects from Morphine or other medications impaired his ability to work, it would be difficult to determine whether any purported side effects were a result of medically necessary prescriptions or as a result of his polysubstance and alcohol abuse, at least until his entry into a "detox" program in September 2006.

a rough day," (AR 32), and that the Provigil was "working pretty well." (AR 37).    Plaintiff further described several medications such as Adderall and Xanax that he longer takes because of side effects.    (AR 31).

Finally, Plaintiff testified that he "could handle a job" where he "could sit up or . . . be able to stand up[]" and "move around a little bit." (AR 30).  Plaintiff explained that he was able to do small jobs, such as occasionally blowing and raking leaves.  (AR 27).  Plaintiff stated that he swims laps, does "other exercises," and can walk "possibly a half a mile" before experiencing pain.  (AR 32).  Plaintiff further stated that he volunteers at his church sometimes as many as 10 or 15 hours per week.  (AR 26).  Plaintiff's testimony regarding his daily activities, which involve a fair amount of physical activity, undermines his assertion that his medications prevent him from working.

In sum, the record does not demonstrate that side effects from Plaintiff's medications interfered with his ability to work.  Thus, the ALJ did not err in failing to consider those side effects in his decision.

**B.    The ALJ Properly Considered The Lay Witness Testimony**

Plaintiff contends that the ALJ failed to properly consider lay witness testimony. (Jt. Stip. at 6-11).  Specifically, Plaintiff argues that the ALJ did not properly consider the statements of his mother, Betty Gifford ("Gifford"), and his pastor, Mrs. Cox. (Jt. Stip. at 6-7).  Plaintiff's claim lacks merit because the ALJ not only discussed

19

their statements, but found these witnesses observations to support a finding of non-disability.

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work.   See Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); 20 C.F.R. §§ 404.1513(d)(4) & (e), and 416.913(d)(4) & (e).   Lay witness testimony as to a claimant's symptoms cannot be disregarded without comment.   See Stout, 454 F.3d at 1053; see also Robbins v. Social Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006).   The ALJ may reject the testimony of lay witnesses only if he gives "reasons that are germane to each witness." Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006), Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).   Furthermore, the reasons that are "germane to each witness" must be specific.   Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (internal quotation marks omitted).

On February 13, 2007, Betty Gifford completed a third-party function report describing Plaintiff's daily activities and abilities. (AR 162-69).   Gifford reported sees Plaintiff approximately three hours per day.   (AR 162).   Gifford explained that Plaintiff reads, drives, watches T.V., does dishes, cooks simple food, does laundry and shops for small grocery items.   (AR 162, 164, 165, 168).   Gifford stated that pain interferes with Plaintiff's sleep.   (AR 163).   She further stated he has "no problem" with personal care.   (AR 163).   Gifford stated that Plaintiff takes himself to church and AA meetings weekly.   Plaintiff also takes his son bowling each week, although he does not bowl himself. (AR 166).   Gifford noted that Plaintiff does not do any house or yard

work because of his pain.  (AR 165).  Gifford indicated that Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, and climb stairs.  (AR 167).  Finally, Gifford noted that Plaintiff sometimes seems fearful and anxious.  (AR 168).

At the June 23, 2008 hearing, Mrs. Cox testified she had known Plaintiff and observed him over the past ten years.  (AR 39-40).  Mrs. Cox explained that for part of the past ten years, Plaintiff was a faithful employee for the same plumbing company her husband worked for. However, she suggested that the plumbing company work caused "overwhelming pain" for Plaintiff.  (AR 40).  Mrs. Cox stated that she believed Plaintiff was attempting not to take medication for the pain and that was also part of the issue.  (Id.).  Mrs. Cox taught the courses that Plaintiff took to become involved in pastor work.  (AR 41). When the ALJ asked her if Plaintiff "did okay in those [courses]?" she stated, "Oh, absolutely."

The ALJ next asked Mrs. Cox to explain the work that Plaintiff does for her church.  She stated:

> He does visitation.  He helps in some of the teaching sometimes.  He and his wife oversee two of the ministries that are the welcome ministries for our church and then the foundational classes for our church.

(AR 42).  This work requires approximately ten hours per week.  (Id.).

21

Finally, Ezra Cox, husband of Mrs. Cox, testified. Mr. Cox was familiar with Plaintiff through the plumbing company they both worked for. Mr. Cox explained that he believed that Plaintiff had a "bad back or something" and that the work at the plumbing company "took its toll on [Plaintiff]." (AR 43). When the ALJ asked Mr. Cox what he believed Plaintiff could do, Mr. Cox testified:

> He could, he could, of course, do office work, that kind of thing. As far as manual labor, I know if he gets down in certain positions or world lift a heavy object as such, it would always come back to harm him.

(AR 44).

In his decision, the ALJ made the following findings:

> After considering the evidence of record, I find that claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons stated below. First, I note that claimant himself has acknowledged that he may be able to do some type of computer work with accommodations. Although he likely cannot return to his past heavy work, claimant appears to be coming to terms with the fact that there is other, lighter, [sic] work

he can perform.   Consistent with this belief, claimant
testified that the Department of Rehabilitation also believes
he can return to some kind of work.   Finally, I note that
Ezra Cox testified that claimant is a good worker and,
although he cannot return to hard labor, he believed that
claimant could perform office-type work . . . I also credit
the February 2007 third party statement from Betty Gifford,
claimant's mother, and the hearing testimony of Sharon and
Ezra Cox to the extent that they are generally consistent
with the above residual functional capacity for a range of
work at the light exertional level.

(AR 14).


The ALJ, therefore, did not reject the lay witness testimony but instead concluded that it supported his RFC findings.   An ALJ "need not discuss <u>all</u> evidence presented to her," but rather must "explain why significant probative evidence has been rejected." <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (internal quotation marks omitted and emphasis in original).   In <u>Vincent</u>, the ALJ did not discuss the lay witness testimony of the claimant's son and former employee.   <u>See</u> <u>id.</u> at 1395.   The Ninth Circuit found that this omission did not require reversal because the lay witness testimony conflicted with the available medical evidence.   <u>See</u> <u>id.</u>


Here, the ALJ did not <u>reject</u> the limitations that Betty Gifford and Mrs. Cox assessed for Plaintiff.   To the contrary, the ALJ specifically stated that he "credit[ed] the February 2007 third party statement from

Betty Gifford, claimant's mother, and the hearing testimony of Sharon and Ezra Cox to the extent that they are generally consistent with the above residual functional capacity for a range of work at the light exertional level."   (AR 14).   Indeed, the ALJ's determination of Plaintiff's RFC incorporated Betty Gifford's stated limitations on Plaintiff's ability to lift, squat, bend, stand, reach, walk, and climb stairs.  (AR 167).  Moreover, Plaintiff's RFC is completely consistent with Betty Gifford's statement that Plaintiff is able to wash dishes and microwave food, (AR 162, 164), and Mrs. Cox's testimony that Plaintiff is able to volunteer at their church for approximately ten hours per week.  (AR 42).

To the extent that the ALJ erred by not providing specific reasons for rejecting some, if any, of Gifford's or Mrs. Cox's statements, the error was harmless.  No reasonable ALJ would have reached a different decision.  See Stout, 454 F.3d at 1056 ("[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.").  The ALJ in this case expressly stated that he was crediting Betty Gifford's report and Mrs. Cox's testimony.  This Court agrees that the statements by Betty Gifford and Mrs. Cox support the ALJ's RFC conclusions.  Any error by the ALJ did not materially impact the ALJ's decision because the ALJ incorporated Gifford's and Mrs. Cox's limitations into the RFC determination.

**C.    Remand Is Not Required To Determine Plaintiff's Ability To Maintain Employment In Light Of The Treating Psychiatrist's Opinion And Plaintiff's Hospitalization**

Plaintiff contends that the ALJ erred when he rejected the opinion of Plaintiff's treating psychiatrist, Dr. Thu, in determining that Plaintiff did not have a severe mental impairment. (Jt. Stip. at 11-12). Specifically, Plaintiff argues that "Dr. Thu has indeed established that the Plaintiff suffers from a mental impairment that causes significant functional limitations." (Id. at 12). Plaintiff's claim lacks merit.

Although the treating physician's opinion is entitled to deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). However, if the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "'clear and convincing' reasons." Lester v. Chater, 81 F.3d 821, 830 (9th Cir., as amended Apr. 9, 1996) (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). Even when the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may reject the treating doctor's opinion only by providing "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Lester, 81 F.3d at 830 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

Here, Dr. Thu treated Plaintiff for addiction to alcohol and narcotic pain mediation. (AR 246). Plaintiff was admitted to the Hemet

Valley Medical Center on September 18, 2006, (id.), and "successfully finished the detoxification treatment protocol and . . . was discharged home on September 29, 2006." (AR 247). Dr. Thu diagnosed Plaintiff with: (1) "Opiate dependence"; (2) "Alcohol dependence, episodic"; (3) "Nicotine dependence, in remission" (4) "Chronic back pain"; (5) "Status post right total hip replacement" (6) "Moderately severe" psychosocial and environmental problems; and (7) a "Global Assessment of Functioning" of 35. (AR 251).

In his decision, the ALJ acknowledged that Plaintiff had "been diagnosed with depression and polysubstance abuse, secondary to both alcohol and prescription pain medications." (AR 12). Indeed, the ALJ cited Dr. Thu's opinion and noted that Plaintiff had "undergone detoxification and follow-up treatment for alcohol and prescription pain medications in September 2006 and April 2007." (Id.). However, the ALJ pointed out that "[i]n October 2006, psychiatric consultative evaluator Romualdo Rodriguez, M.D., diagnosed depression and alcohol dependence, both in remission, with a global assessment of functioning (GAF) of 70 and no functional limitations." (Id.). The ALJ further noted that "[i]n October 2006 and March 2007 opinions, the Disability Determination Services (DDS) medical advisors concurred with the finding of no severe mental impairment." (AR 12-13). Finally, the ALJ pointed out that "at the hearing, [Plaintiff] alleged inability to work due to orthopedic problems and did not allege a severe mental impairment." (AR 13).

Thus, the ALJ considered Dr. Thu's opinion and provided specific reasons why he gave more weight to the opinions of Dr. Rodriguez and the state agency physicians, Dr. Amado and Dr. Gregg. Indeed, Dr. Thu's GAF

rating of 35 was contradicted by Dr. Rodriguez who assessed Plaintiff with a GAF rating of 70, (AR 268), and both Dr. Amado and Dr. Gregg found that Plaintiff did not have a severe mental impairment. (AR 288, 303). As noted by the ALJ, Dr. Rodriguez's, Dr. Amado's, and Dr. Gregg's opinions were all more recent than Dr. Thu's opinion. (AR 12-13). Dr. Thu's opinion was rendered at a time when Plaintiff was still admittedly suffering from addiction problems. Additionally, the ALJ pointed out that Plaintiff never claimed to have a severe mental impairment during the hearing. (AR 13). To the contrary, Plaintiff only described limitations on his ability to work in terms of pain in his back, (AR 34), and stated that he "could handle a job" where he "could sit up or . . . be able to stand up[]" and "move around a little bit." (AR 30). The only time Plaintiff discussed his mental state, Plaintiff stated that his antidepressants had "helped" and that he was working on transitioning off antidepressants entirely. (AR 38).

It is true that step two of the five step evaluation process is a de minimis test — intended to weed out the most minor of impairments. See Bowen v. Yuckert, 482 U.S. 137, 153-54, 107 S. Ct. 2287, 2299-300, 96 L. Ed. 2d 119 (1987) (O'Connor, J. concurring). An ALJ may find an impairment not severe "only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation marks omitted and emphasis in original); Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) ("We have defined the step-two inquiry as "a de minimis screening device to dispose of groundless claims." (internal quotation marks omitted)). "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination

27

of impairments only when his conclusion is clearly established by medical evidence." Webb, 433 F.3d at 687 (internal quotation marks omitted).  Nonetheless, the medical evidence here suggested that if Plaintiff suffers from any mental impairment, that impairment is only a slight abnormality with a minimal effect on Plaintiff's ability to work.  The opinions of Dr. Rodriguez, Dr. Amado, and Dr. Gregg all support this conclusion. Substantial evidence, therefore, supported the ALJ's finding that Plaintiff did not suffer from a severe mental impairment.

Even if the ALJ erred, however, in his conclusion regarding the severity of Plaintiff's mental impairment, the error was harmless.  See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error rule applies to review of administrative decisions regarding disability); Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984) (same).  Had the ALJ found a severe mental impairment, he would nonetheless have looked to Dr. Rodriguez's, Dr. Amado's, and Dr. Gregg's evaluations to determine what impact, if any, Plaintiff's mental impairment had on his ability to work, because Dr. Thu's opinion did not include any such limitations. (AR 246-55).  As noted above, those doctors' evaluations, finding only mild limitations, (AR 268-69, 286, 303), would not have significantly altered the ALJ's conclusions regarding Plaintiff's RFC.  Accordingly, remand is not required on this claim.

**VIII.**

**CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[5] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: February 8, 2010.

/S/

_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[5] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

29